IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| CAROL H.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 5:20-cv-00035 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Carol H. asks this Court to review the Commissioner of Social Security's final

decision denying her application for disability insurance benefits ("DIB") under Title II of the

Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under

28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and

the applicable law, I find that the Commissioner's final decision is supported by substantial

evidence and should be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. *See* 42
U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Carol applied for DIB in January 2017, Administrative Record ("R.") 189–93, alleging she was disabled because of chronic obstructive pulmonary disease ("COPD"), neuropathy or peripheral neuropathy, sciatica, radiculopathy, spinal stenosis pain, chronic pain disorder, depression, and anxiety, R. 105–06. She alleged that she became disabled on August 10, 2016. R. 105. She was fifty-five years old, or a person of "advanced age" under the regulations, on her alleged disability onset date. *See id.*; 20 C.F.R. § 404.1563(e). Disability Determination Services ("DDS"), the state agency, denied her claim initially in August 2017, R. 105–19, and upon reconsideration in February 2018, R. 122–39. In April 2019, Carol appeared with counsel and testified at an administrative hearing before ALJ Suzette Knight. R. 48–60. A vocational expert ("VE") also testified at the hearing. R. 61–65.

ALJ Knight issued an unfavorable decision on April 30, 2019. R. 21–37. First, she found that Carol had not engaged in substantial gainful activity between August 10, 2016, the alleged onset date, and September 30, 2018, the last date Carol met the Act's insured-status

requirements.[4] R. 26. At step two, ALJ Knight found that Carol had two severe impairments during the relevant period: COPD and degenerative disc disease of the lumbar spine with radiculopathy. *Id.* Her other impairments, including anxiety and depression, were non-severe because they did not cause more than minimal limitation in Carol's ability to "perform basic work activities." *See* R. 26–29 (finding that Carol's mental impairments caused "mild" overall limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing herself). At step three, ALJ Knight concluded that none of Carol's impairments, considered both alone and in combination, met or equaled any relevant Listing. R. 29–30 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.00(K)(3), 1.04, 3.02). ALJ Knight then evaluated Carol's residual functional capacity ("RFC") and determined that she could perform "light" work[5] with additional limitations. R. 30. She could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds; she could occasionally balance, stoop, kneel, crouch, and crawl; she could occasionally push and pull with her right lower extremity; she could tolerate occasional exposure to humidity, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibration; and she could never work at unprotected heights. *Id.*

Based on this RFC finding and the VE's testimony, ALJ Knight concluded that Carol could return to her past relevant work as a companion and office assistant, either as actually or as

---

[4] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Carol] must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 655–56.

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

generally performed. R. 36 (citing R. 62–64). ALJ Knight therefore found that Carol was "not

disabled" from August 10, 2016, the alleged onset date, through September 30, 2018, the date

last insured, and denied her application for benefits. *Id.* The Appeals Council denied Carol's

request for review, R. 1–3, thereby making ALJ Knight's written decision "the final decision of

the Commissioner" denying her DIB claim, R. 1. This appeal followed.

### III. Discussion

Carol challenges the ALJ's RFC determination. *See generally* Pl.'s Br. 8–18, ECF No.

16. First, she argues that ALJ Knight failed to properly weigh the opinions of Dale Carroll, M.D.,

and Robin Rider, C.F.N.P. *Id.* at 8–15. Second, she argues that ALJ Knight's decision is not

supported by substantial evidence because she identified "mild" limitations in each of the four

mental functional areas, but failed to include any mental limitations in Carol's RFC. *Id.* at 16–18.

Her arguments are not persuasive.

*A.    Summary*

*1.    Treatment Notes*

In October 2011, Carol visited Allan Fergus, M.D., at the Virginia Brain and Spine

Center, reporting right low back pain that radiated into her leg and foot. R. 290. Dr. Fergus

assessed a herniated lumbar disc, R. 291, and performed a right L5-S1 posterior

hemilaminectomy and discectomy, R. 293. Three years later, in September 2014, Carol saw

Robin Rider, C.F.N.P., at Page Memorial Hospital. *See* R. 343–47. She reported that she was

"doing well." R. 344. She had seen Dr. Fergus for a round of injections after her surgery, but

they were "not effective." *Id.* She also reported that Dr. Fergus told her additional surgery would

help her leg pain, but not her back pain. *Id.* Accordingly, Carol told NP Rider that she "would

just prefer to treat conservatively." *Id.* NP Rider observed normal physical and psychiatric exam

findings and assessed lumbar disc disease with radiculopathy, dysthymic disorder, and generalized anxiety disorder. R. 345–47. She noted that those conditions were "[s]table on medication" and prescribed Norco for back pain. R. 346–47; *see also* R. 344 (listing Carol's current medications, including Xanax, gabapentin, Ambien, Wellbutrin, Parafon Forte, and Effexor).

NP Rider made similar findings at subsequent visits. In April 2015, Carol reported that she was "doing well" and that her medications were keeping her back pain and mood stable. R. 336. NP Rider observed normal exam findings and directed Carol to continue her medications. R. 337. In October 2015, Carol again reported that her medications kept her mood stable and controlled her pain. R. 328. She also endorsed muscle stiffness and weakness in the mornings that "improve[d] after taking a shower and walking." *Id.* NP Rider observed normal exam findings and diagnosed hereditary and idiopathic neuropathy, lumbar disc disease with radiculopathy, generalized anxiety disorder, and dysthymic disorder, all of which were stable. R. 330–31. In April 2016, Carol was "doing well" and reported that she "remain[ed] active at home." R. 323 (reporting a stable mood and controlled pain). NP Rider observed normal exam findings, R. 324–25; assessed lumbar disc disease with radiculopathy, dysthymic disorder, generalized anxiety disorder, chronic pain syndrome, and primary insomnia, all of which were stable; and directed Carol to diet, exercise, and continue her medications. R. 326.

In November 2016, Carol returned to NP Rider and reported that her "chronic pain remain[ed] stable," that she did not need an increase in pain medication, and that she "still enjoy[ed] many things and activities in her life." R. 312. She was "having some radicular pain down her right leg" and felt that her right leg was "starting to get a little weak," but she did "not wish to see a neurosurgeon" and said she would "just be careful." *Id.* She also reported that she

6

"kn[ew] the exercises she need[ed] to do to help improve her back but ha[d] not been doing

them" and declined a referral to physical therapy. *Id.* NP Rider observed normal exam findings,

R. 313–14, noted "slightly symptomatic" lumbar disc disease, R. 314, and told Carol to continue

her medications and "increase her strengthening exercises," *id.* In June 2017, Carol returned to

NP Rider, who observed normal exam findings, R. 495–96, and noted "intermittent chronic back

pain and idiopathic neuropathy," R. 497. She also admonished Carol for cancelling a pain

management appointment, explaining that she had referred Carol to pain management pursuant

to new guidelines on prescribing pain medication. R. 494; *see also* R. 498. Carol reported feeling

anxious and nervous. R. 495.

A week later, Carol visited the National Pain & Spine Centers for an initial consultation.

R. 460–65. She reported pain in her lower back and bilateral legs, rated four out of ten in severity

during this visit, that was "continuous, throbbing, aching, shooting and severe" and associated

with "numbness, weakness, tingling and [a] pins/needles" feeling. R. 460. Sitting, standing,

walking, lifting, driving, and bending in any direction exacerbated her pain. *Id.* "Mitigating

factors include[d] sitting, standing, avoiding strenuous activity[,] and pain medication." *Id.* The

provider noted that Carol was taking pain medication, had "tried multiple courses of physical

therapy," and had tried lower back injections. *Id.* He observed "mild diffuse tenderness to

palpation" of the lumbar area; "[m]oderate tenderness [to] palpation of the right sacroiliac joint";

restricted flexion, extension, and side bending bilaterally; normal lower extremity strength;

normal lower extremity sensation to light touch; and ability to "toe walk" and "heel walk"

without assistance. R. 462. A sacroiliac joint instability and ligament pain provocative maneuver

and a straight leg raise test were positive on the right and negative on the left. *Id.* He assessed

radiculopathy of the lumbar and lumbosacral regions, intervertebral disc disorders with

radiculopathy of the lumbosacral region, other intervertebral disc displacement of the lumbosacral region, postlaminectomy syndrome not elsewhere classified, and low back pain lumbago not otherwise specified. R. 463. He also prescribed Lyrica and Hysingla, directed Carol to stop taking Norco, and requested records from her providers to "see if she is a candidate for some other type of intervention such as lumbar medical branch blocks, radiofrequency ablation, or a trial of spinal cord stimulation." R. 463–64. Two weeks later, Carol returned. R. 456–59. She reported that Hysingla and Lyrica were too expensive under her insurance plan. R. 458. Accordingly, her provider prescribed gabapentin (in lieu of Lyrica) and extended-release hydromorphone (in lieu of Hysingla). *Id.*

In September 2017, Carol returned to NP Rider. *See* R. 487–90. She reported that the long-acting opioids prescribed by the National Pain and Spine Centers were making her "extremely lethargic, nauseous, and just generally . . . miserable," such that she was unable to "complete her activities of daily living." R. 487. NP Rider reviewed recent MRI results, *id.*; *see also* R. 511–14, which "clearly show[ed] a downward trend regarding the health of [Carol's] lower spine" and revealed that she had "progressive lumbar stenosis with a grade 1 anterolisthesis at L4 and 5," R. 487. NP Rider also noted that Carol expressed fear of surgery because of a bad post-operative experience following her 2011 back surgery. *Id.*

In January 2018, Carol began pain management at ALTMED Medical Center. *See* R. 549–50. She told Jerry Lee, M.D., that her surgeon planned to perform another back surgery, but that the surgery was "on hold due to insurance reasons." R. 549; *see also* R. 554. Dr. Lee observed normal exam findings; noted that Carol was "work[ing] full time"; and diagnosed lumbar radiculopathy and spinal stenosis, postlaminectomy syndrome not elsewhere classified, intervertebral disc disorders with radiculopathy in the lumbosacral region, and arthropathy of the

8

lumbar facet. R. 549–50. He noted that Carol was not taking her gabapentin because it made her drowsy, told her to take it before bed, and prescribed oxycodone. R. 550.

Carol continued treatment at ALTMED through February 2019. She typically treated with April Brittain, A.N.P., who consistently observed no apparent distress, normal gait, "tender midline" in the lumbosacral spine, intact lumbosacral range of motion, decreased right lower extremity sensation, intact lower extremity strength, and the ability to "twist and turn at the waist, and bend over with difficulty in [an] attempt to touch [her] toes." R. 562 (Jan. 2018); *see also* R. 567, 573, 580, 585, 590, 596, 601, 606, 611, 644, 649, 654, 664. NP Brittain noted that Carol was not taking her gabapentin "for some reason" and encouraged her to do so. R. 562 (Jan. 2018); *see also* R. 567 (Feb. 2018). By March 2018, Carol was taking gabapentin consistently, which she reported "[h]elped overall." R. 573; *see also* R. 580. In April, Carol reported that her pain rated six out of ten in severity and was accompanied by constipation, lack of appetite, and fatigue. R. 580. NP Brittain again noted that "[u]sing gabapentin consistently made a difference," directed Carol to continue her medications, and suggested that Carol take a hot shower each night, try Lidocaine patches, take Aleve consistently, and follow up on a possible ultrasound "to break up the stenosis in her back." R. 580–81. Carol's insurance provider would not cover the ultrasound. *See* R. 585.

In May 2018, NP Brittain noted that Carol would not have an ultrasound, told her to discontinue Lidocaine patches because they did not help, and otherwise reaffirmed her prior recommendations. R. 586. In June and July, Carol reported waking up at night because of pain. R. 590, 596. NP Brittain prescribed a "small increase" in Carol's dose of oxycodone, R. 590, and then suggested Carol try taking Benadryl, R. 596. From August 2018 through February 2019, NP Brittain's treatment recommendations were the same. Carol reported that Benadryl helped her

9

sleep and NP Brittain directed Carol to take the same medication dosages, take a hot shower

before bed, and take Aleve consistently. *See* R. 601–02, 606–07, 611–12, 644–45, 649–50, 654–

55, 664–65. Carol's providers also noted that she remained active. She consistently reported

working full time managing a rental property, *see* R. 573, 580, 585, 590, 596, 601, 606, 611, 644,

649, 654, 664, she planned and went on a cruise in September 2018, *see* R. 597, 602, 607, 612,

645, and she reported that her activities of daily living were "fine" in January 2019, R. 659.

    2.    *Medical Opinions*

    In May 2017, Dale Carroll, M.D., performed a consultative examination. R. 388–95.

Carol reported COPD, peripheral neuropathy, sciatica, spinal stenosis, chronic pain disorder,

depression, and anxiety, and she explained that she could handle "bathing, dressing, grooming,

mouth care, toileting, transferring, walking, climbing stairs, eating, cooking, managing

medications, using the telephone, doing laundry, driving, and managing finances" without

assistance. R. 388–89. By contrast, she needed "some assistance" with shopping and housework.

R. 389. Dr. Carroll observed 2+ pulses throughout; tenderness to palpitation in the midline of

Carol's spine; bilateral paravertebral tenderness and spasm; tenderness to palpation "over the

proximal distribution of the sciatic nerves, bilaterally"; and normal neck, cardiovascular, lung,

abdomen, extremity, and skin findings. R. 390. Carol's neurological exam was generally normal,

revealing a neutral mood; intact affective range; no psychomotor restlessness or expressed

anxiety; clear and coherent speech; appropriate verbal content; and intact memory,

concentration, fund of knowledge, judgment, and insight. *Id.* Carol had intact sensation to light

touch, a normal filament exam, and intact discrimination; on the other hand, she had decreased

pin prick sensation over the right anterior lateral thigh and increased pin prick sensation over the

left lateral thigh. R. 391. She had 2+ deep tendon reflexes in most areas, normal gait, intact

muscle tone, and full muscle strength throughout her upper and lower extremities. *Id*. Carol had

no joint tenderness, erythema, increased heat, swelling, effusion, or deformities; her digit-to-digit

testing was accomplished without difficulty or dyscoordination; her fine manual dexterity was

intact; and her finger-to-nose, nose-to-finger, and rapid alternative movement of palms tests were

performed without difficulty. R. 391–92. Carol's range of motion was normal in her shoulders,

elbows, wrists, hands, hips, knees, ankles, and cervical spine, but was somewhat reduced in her

lumbar spine. *See* R. 393–94. Based on these findings and Carol's report, Dr. Carroll diagnosed

COPD, degenerative disc disease of the lumbar spine with residual radiculopathy, spinal

stenosis, chronic pain syndrome, depression and anxiety (both "prognosis stable"), and elevated

blood pressure. R. 395. He opined that she could stand, walk, and sit each for "at least 2 hours

per workday with usual breaks"; could lift and carry up to twenty pounds frequently and twenty-

five pounds occasionally; would have "[r]estrictions on pushing and pulling . . . based upon the

weight of the object to be moved, surface over which [it] is to be moved and presence/absence of

assistive technologies"; could occasionally stoop, crouch, and kneel, but could not crawl; could

frequently reach and handle objects; had normal feeling in her fingertips; could grasp with

fingers and hands bilaterally; and had "no difficulties fingering such as pinching or picking up

small objects." R. 392. Carol also had "intact" gait and station, could "sit, stand and walk

unassisted," and could "handle objects with both gross and fine manual motor dexterity." R. 394.

In July 2017, NP Rider provided a medical source statement regarding Carol's functional

abilities and limitations. *See* R. 469–71. She opined that Carol would miss zero days of work per

month because of her medical conditions; could stoop "infrequently," meaning she could

perform the activity "very little if at all on some days"; stand, walk, and climb "occasionally," or

"up to 1/3 of an 8-hour workday"; and sit "frequently," or from "1/3 up to 2/3 of an 8-hour

workday." R. 469. Carol could occasionally lift 11–20 pounds and frequently lift up to ten

pounds; and could frequently use her hands, "on a full time basis," for fine and gross

manipulation and raise both arms over her shoulders. *Id.* She opined that Carol's conditions

caused "moderate" pain, but that Carol did not need to elevate her legs or lie down because of

pain, fatigue, or any other impairment. R. 470. Carol would be off-task ten percent of an average

workday and had "satisfactory" abilities to understand and remember both short, simple and

detailed instructions, perform activities within a schedule and maintain regular attendance,

sustain an ordinary routine, work in coordination with or proximity to others without distraction,

adapt to ordinary stress or changes in the workplace, and maintain attention and concentration

for extended periods. *Id.* ("Please assess patient's ability to work as a result of pain, medication

and/or mental impairment: Satisfactory[,] Occasionally Precluded[,] Frequently Precluded[,] No

Functioning"). Carol did not have any problems interacting with the general public, but she had

"limitations" in asking simple questions or requesting assistance, accepting instructions and

responding appropriately to criticism from supervisors, getting along with co-workers or peers,

maintaining socially appropriate behavior, and adhering to basic standards of neatness and

cleanliness. R. 471. Finally, NP Rider opined that Carol's sleep was not affected by her

conditions, that neither her conditions nor medications caused lapses in memory or

concentration, that she would not need to take unscheduled breaks during an eight-hour day, and

that her limitations had not and were not expected to last for twelve consecutive months or

longer. *Id.*

Also in July 2017, Joseph Cianciolo, Ph.D., performed a consultative psychological

assessment. *See* R. 472–73. He interviewed Carol and noted that she appeared able "to attend to

activities of daily living without assistance," but was moderately socially isolated. R. 472. He

also noted that she was taking Effexor, Wellbutrin, Ambien, gabapentin, and hydromorphone; she indicated a "10 year history of depressive illness"; and she reported "pervasive dysphoria, anhedonia, decreased interest, decreased motivation, increased social isolation, and frequent crying spells with minimal precipitant." *Id.* Dr. Cianciolo observed that Carol was fully alert and oriented, had adequate grooming and hygiene, arrived for her appointment on time, and appeared well-nourished. R. 473. He observed "[m]ultiple pain coping behaviors," normal speech and eye contact "with sporadic offgazing," a dysphoric and congruent mood, a tearful affect, logical and goal-directed thoughts, adequate insight and judgment, average intelligence, grossly intact memory, and good recall. *Id.* Accordingly, Dr. Cianciolo opined that "[d]espite taking psychotropic medication as prescribed," Carol had "full neurovegetative symptomology consistent with a diagnosis of . . . major depressive disorder, single episode, moderate." *Id.* He further opined that she had "the intellectual capability necessary to perform simple and repetitive tasks as well as detailed tasks," had "mildly impaired" ability to complete a normal workday or workweek "without interruption from psychiatric condition," would not likely require additional supervision in the workplace, appeared capable of accepting instruction from supervisors, had "moderately compromised" abilities to interact with coworkers and the public and cope with routine stressors encountered in competitive work environments, and could adequately manage her own funds. *Id.* Finally, he opined that Carol's "[p]rognosis for significant change would appear to be guarded." *Id.*

In August 2017, on initial review for DDS, R.S. Kadian, M.D., opined that Carol could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; she was not limited in her ability to push and pull, up to the weights and frequencies listed "for lift and/or carry"; she could stand/walk and sit for about six hours in an eight-hour workday; she could

occasionally balance, stoop, kneel, crawl, and climb ramps/stairs, but could never climb ladders/ropes/scaffolds; and she had to avoid concentrated exposure to extreme heat, extreme cold, humidity, and fumes, odors, dusts, gases, and poor ventilation. R. 115–16. She had no manipulative, visual, or communicative limitations. R. 116. Alan Entin, Ph.D., A.B.P.P., also assessed Carol's mental functioning. R. 113. He opined that Carol had "mild" limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* He did not provide a mental RFC assessment, but he opined that Carol's depression and anxiety did "not cause more than a mild limitation," that she had "been stable on a medication regimen with normal" mental status exams showing "intact memory, concentration, and thought process," and that her mental impairments were "non severe." *Id.* In February 2018, on reconsideration for DDS, Bert Spetzler, M.D., affirmed Dr. Kadian's opinion of Carol's physical limitations, R. 134–36, and Leslie E. Montgomery, Ph.D., A.B.P.P., affirmed Dr. Entin's opinion of Carol's mental impairments and related "mild" limitations, R. 131.

      *3.*     *Carol's Statements*

In March 2017, Carol submitted a Function Report to DDS. *See* R. 217–24. She reported that she lived alone, took care of her cat, and could not stand or sit for more than an hour at a time. R. 217–18. She had no difficulty with personal care, but she sometimes woke up in pain and had trouble sleeping and getting up. R. 218. She managed her medications by putting them in pill boxes for herself, made simple meals, did "light cleaning a little at a time" (laundry, dishes), had to sit down after about an hour of cleaning, and needed reminders to do housework. R. 219. She did not mow her lawn. R. 219–20. Carol could drive and could go out independently, and she shopped online and in stores for groceries, clothes, presents, and household items. R.

220. She read, watched television, and bird-watched, but she had difficulty concentrating at times. R. 221. She communicated with others electronically "once or twice a month," and she "might get together with a friend" once a month. R. 221. She had no trouble getting along with family, friends, neighbors, or others, but she was "afraid" she would have a panic attack or have her back "go out" while in public. R. 222. Carol reported that she could lift twenty pounds, could stand and sit for an hour at a time, had pain when climbing stairs, could walk for half an hour before needing to rest for fifteen minutes, could follow written instructions and get along with authority figures "fairly well," did not finish what she started, had trouble following spoken instructions, and did not handle stress or changes in routine well. R. 222–23.

In January 2018, Carol endorsed similar functional abilities and limitations. *See* R. 234–41. She reported some difficulties with personal care, including trouble bending over to dress, fear of falling over if her leg gave out while bathing or caring for her hair, and issues with driving "very long." R. 235. She took care of her cat, made simple meals, and drove to pick up essentials once or twice a week. R. 235–37. She cleaned for short periods of time and could not be on her feet for more than fifteen minutes at once. R. 236. She interacted with others electronically "every couple of days," and she did not otherwise report participating in social activities. R. 238–39. Finally, Carol reported that she could lift ten pounds; standing, walking, and bending too long made her legs "go out"; her thoughts sometimes became "fuzzy"; she could walk for fifteen minutes before needing to rest for thirty minutes; she could pay attention for fifteen minutes; that she did not finish what she started; she could follow instructions as long as they were "not to[o] long"; she got along with authority figures "very well"; and she did not handle stress or changes in routine well. R. 239–40.

In April 2019, Carol testified at the administrative hearing before ALJ Knight. R. 48–60. She said that she lived with a roommate, drove once or twice a week to the store, and managed her own checking account. R. 49–51. She explained that she could not work because her medications made her drowsy, her leg hurt when standing for more than fifteen to twenty minutes, she got "severe muscle spasms" in her back, and back pain prevented her from lifting. R. 55–56. On a typical day between August 2016 and September 2018, Carol woke up early because she "couldn't get comfortable," made coffee, took her medications, and sat down to watch the news before falling asleep in her chair. R. 58. She tried to shower every other day (which usually wore her out); she made simple meals, fed her cats, and did laundry; and she went to the store for essentials about once a week. R. 58–59. Family members helped with household chores. R. 59. She did not engage in social activities such as going to church, the movies, or the mall, and she visited with friends "[m]aybe two or three times a year." R. 60. Her family had rental properties, but she was not very involved with the business and her brother handled all the maintenance issues. *See id.* Medication helped her pain, R. 56, and Carol explained that she had also had a surgery, injections, and physical therapy. R. 56–57. Carol had anxiety and depression. R. 57. She took "several different" medications for mental health symptoms, which were prescribed by her family care doctor. R. 57. She did not treat with a counselor or psychiatrist, and she endorsed difficulties with attention and concentration, understanding information or instructions, making decisions, and interacting with others. R. 57–58.

B.    *The ALJ's Decision*

At step two, ALJ Knight determined that Carol had two severe impairments during the relevant time: COPD and degenerative disc disease of the lumbar spine with radiculopathy. R. 26. She determined that Carol's other impairments were non-severe because they did not "more

16

than minimally" affect her ability to do basic work activities. R. 27; *see also* R. 26–29. In

particular, Carol's depression and anxiety were not severe impairments because they caused only

"mild" limitation in her abilities to understand, remember, and apply information; interact with

others; concentrate, persist, or maintain pace, and adapt or manage oneself. R. 28–29. At step

three, ALJ Knight determined that neither of Carol's severe impairments met or equaled a

Listing. R. 29–30.

In determining Carol's RFC, ALJ Knight considered all evidence in the record, including

medical opinions, treatment history, and Carol's statements. R. 30–35. She found that Carol's

"medically determinable impairments could reasonably be expected to cause [Carol's] alleged

symptoms," but that her "statements concerning the intensity, persistence and limiting effects of

th[o]se symptoms [were] not entirely consistent with the medical evidence and other evidence in

the record." R. 31. Despite Carol's reports that her legs "gave out," she could stand for only

fifteen to twenty minutes, and her medication caused "drowsiness, poor concentration, and

fogged thinking," R. 31, for example, the record revealed generally normal exam findings

(normal range of motion, muscle tone, coordination, gait, motor strength, etc.) and showed that

her symptoms were generally controlled with medication, *see* R. 31–33.

ALJ Knight gave "significant, but not great, weight" to the DDS physicians' assessments

of Carol's physical RFC. R. 34. She discussed their opinions in detail, explaining that they were

consistent with examination findings, which generally showed good range of motion (other than

in Carol's back) and which did not show any gait abnormalities, difficulty sitting, standing, or

walking during appointments, or "diminished strength in any area." *Id.* ALJ Knight also

explained that she gave the DDS physicians' opinions "significant" rather than "great" weight

because the medical and other evidence supported "additional limitations in [Carol's] abilities to

push and pull with her right lower extremity and work around vibrations and unprotected heights," which the DDS physicians "fail[ed] to assess." *Id.*

By contrast, ALJ Knight gave only "partial" weight to Dr. Carroll's opinion. R. 34–35. She explained that his opinion was "not entirely consistent with the medical evidence, which show[ed] the claimant had a greater capacity for standing, walking, sitting, and crawling" than Dr. Carroll found, but that she was "somewhat more limited in lifting and carrying." *Id.* ALJ Knight also explained that Dr. Carroll's opinion that Carol could only "frequently" reach and handle bilaterally was unsupported by the medical evidence. R. 35. Specifically, she explained that "examinations did not reveal any abnormalities in the claimant's manual dexterity, upper extremity range of motion, or grip strength, and, during his own evaluation of the claimant, Dr. Carroll noted the claimant could handle objects with both gross and manual motor dexterity." *Id.*

Finally, ALJ Knight gave "some" weight to NP Rider's opinion. *Id.* She explained that NP Rider's opinion was "just partially consistent with the medical evidence," which "demonstrate[d] that the claimant was not as limited in her abilities to stand, walk, stoop, use her hands, and lift her arms as Dr. Rider f[ound] for the reasons detailed above."[6] *Id.* She also found that NP Rider's opinion regarding Carol's mental functional limitations was unsupported, citing Carol's daily activities. *Id.*

---

[6] As a certified family nurse practitioner, NP Rider is not an acceptable medical source under the regulations. *See* 20 C.F.R. § 404.1513(a); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). As a non-acceptable medical source, her opinion is "important" and may offer insight into the severity of Carol's functional limitations, SSR 06-03p, 2006 WL 2329939, at *3, but it is not a "medical opinion" as defined by the regulations, *see* 20 C.F.R. § 404.1527(a)(1) (defining medical opinions as "statements from *acceptable medical sources* that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions") (emphasis added). Nonetheless, ALJ Knight referred to NP Rider as an "M.D." and appears to have considered her opinion to be a "medical opinion" under the regulations. *See* R. 35.

18

C.    *Analysis*

First, Carol argues that ALJ Knight failed to properly weigh Dr. Carroll's and NP Rider's opinions. Pl.'s Br. 8–15. Second, Carol argues that ALJ Knight's decision is not supported by substantial evidence because she found Carol to have "mild" limitations in each of the four functional areas of the psychiatric review technique, but she failed to incorporate any mental limitations into Carol's RFC. *Id.* at 16–18.

1.    *ALJ Knight adequately explained why she discounted Dr. Carroll and NP Rider's opinions regarding Carol's physical functional limitations*

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and related symptoms.[7] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "functional limitations or restrictions caused by medical impairments and their related symptoms," including pain, that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). The ALJ has broad (but not unbounded) discretion to determine whether an alleged symptom or functional limitation is supported by or consistent with other relevant evidence, including objective evidence of the underlying medical impairment, in the claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at

---

[7] "Symptoms" are the claimant's own description of her medical condition. 20 C.F.R. § 404.1502(i).

*5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear that she

considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of*

*Soc. Sec. Admin.*, 873 F.3d 251, 267–72 (4th Cir. 2017), and she built an "accurate and logical

bridge from that evidence to [her] conclusion" that the claimant is not disabled, *Woods v.*

*Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quotation marks and other brackets omitted). *See*

*Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019); *Patterson v. Comm'r of Soc. Sec.*,

846 F.3d 656, 662 (4th Cir. 2017).

Carol's argument focuses heavily on Dr. Carroll's opinion. *See* Pl.'s Br. 8–15. She

contends that Dr. Carroll "conducted a thorough examination that supports his opinion" and

asserts that ALJ Knight "mischaracteriz[ed] the objective medical evidence" and did not

"adequately address significant conflicting evidence in [her] summary." *Id.* at 10. She further

argues that the objective medical evidence *does* generally support the limitations Dr. Carroll

found. *Id.* at 11–13. And she argues that Dr. Carroll's opinion "is consistent with" NP Rider's

"medical source statement," which also found that Carol had "limitations in standing and

walking, in using her hands and fingers, in her ability to reach, and in her ability to remain on

task as a result of her condition." *Id.* at 13–14. She explains that ALJ Knight also discounted NP

Rider's opinion, giving it "some" weight and "rejecting only those portions that were dispositive

of Plaintiff's claim for disability" without acknowledging that NP Rider's "opinion was

consistent with Dr. Carroll's opinion and supportive of the limitations he identified." *Id.* at 14.

Finally, Carol argues that ALJ Knight's failure to properly evaluate these opinions was not

harmless. *Id.* at 15. She asserts that Dr. Carroll's opinion that Carol "did not ha[ve] the ability to

sit, stand, and walk more than 2 hours each in an 8-hour workday" would render Carol disabled

under the regulations if credited by the ALJ. *Id.* (explaining that Carol would "grid out" under

the Medical-Vocational Guidelines because of her age if she were limited to sedentary work

(citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.06)). *But see* R. 392 (Dr. Carroll opining that

Carol "can stand for at least 2 hours per workday," "can walk for at least 2 hours per workday,"

and "can sit for at least 2 hours per workday with normal breaks").

Aside from arguing that NP Rider's opinion supports and is supported by Dr. Carroll's

opinion, Carol's brief makes little mention of NP Rider's opinion. *See generally id.* at 8–15. In

particular, she does not discuss or in any way challenge ALJ Knight's consideration of NP

Rider's opinion as to Carol's mental functional limitations. *Id.* Accordingly, I consider only

whether ALJ Knight properly rejected Dr. Carroll's and NP Rider's opinions of Carol's

impairment-related physical limitations.

ALJ Knight adequately explained why she discounted Dr. Carroll's and NP Rider's

opinions. "Medical opinions" are statements from "acceptable medical sources," such as

physicians, that reflect the source's judgments about the nature and severity of the claimant's

impairment, including her symptoms, prognosis, functional limitations, and remaining abilities.

20 C.F.R. § 404.1527(a)(1). The ALJ must adequately explain the weight afforded to every

medical opinion in the record, taking into account factors such as the nature and extent of the

source's treatment relationship with the claimant; how well the source explained or supported the

opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains

to the source's area of specialty. *Id.* § 404.1527(c). A reviewing court "must defer to the ALJ's

assignments of weight" among differing medical opinions unless her underlying findings or

rationale "are not supported by substantial evidence" in the record, *Dunn v. Colvin*, 607 F. App'x

264, 271 (4th Cir. 2015), or they were reached by means of an improper standard or

misapplication of the law, *see Coffman*, 829 F.2d at 517.

ALJ Knight's discussion of her reasons for giving "partial" weight to Dr. Carroll's

opinion and "some" weight to NP Rider's opinion meets this "deferential standard of review."

*Dunn*, 607 F. App'x at 271. She explained that Dr. Carroll's opinion was "not entirely

consistent" with the medical evidence, which showed that Carol had a greater ability to stand,

walk, sit, and crawl and a lesser ability to lift and carry than Dr. Carroll identified. R. 34–35. She

also explained that NP Rider's opinion was "just partially consistent with the evidence" which

"demonstrate[d] that the claimant was not as limited in her abilities to stand, walk, stoop, use her

hands, and lift her arms" as NP Rider found. R. 35. And she discussed the objective medical

evidence at length when explaining how it supported the DDS physicians' opinions. *See* R. 34.

She explained, for example, that the medical evidence did not support Carol's allegations that

she "could not sit, stand, or walk for very long" without changing positions because her

"clinicians generally did not observe" any gait abnormalities or "note that she appeared

uncomfortable performing these activities." *Id.* (citing R. 308–83, 387–466, 483–542, 548–615).

She also explained that Carol's examinations did not reveal "diminished strength in any area"

and showed "good range of motion" in all areas except her back. *Id.* These reasons are supported

by substantial evidence. Carol's providers generally observed normal findings on exam,

including normal range of motion and no muscular tenderness. *See, e.g.*, R. 345 (Sept. 2014); R.

337 (Apr. 2015); R. 330 (Oct. 2015); R. 324 (Apr. 2016); R. 313–14 (Nov. 2016); R. 495–96

(June 2017); R. 457 (June 2017); R. 489 (Sept. 2017). And although they noted some back

tenderness and reduced range of motion at times, they did not note and Carol did not report any

limitations on her ability to sit, stand, or walk. *See* R. 394 (May 2017); R. 462 (June 2017); R.

549 (Jan. 2018); R. 562 (Jan. 2018); R. 567 (Feb. 2018); R. 573 (Mar. 2018); R. 580 (Apr.

2018); R. 585 (May 2018); R. 590 (June 2018); R. 596 (July 2018); R. 601 (Aug. 2018); R. 606

(Sept. 2018); R. 611 (Oct. 2018); R. 644 (Nov. 2018); R. 649 (Dec. 2018); R. 654 (Jan. 2019); R.

659 (Jan. 2019); R. 664 (Feb. 2019). Instead, they consistently observed normal gait during the

relevant period, *see, e.g.*, R. 649, 654, 659, 664, and noted that Carol had no difficulties with

activities of daily living several months after her insured-status expired, R. 659 ("ADLs fine"

(Jan. 2019)). Carol similarly indicated an active lifestyle, reporting through 2019 that she worked

full time managing a rental property, R. 549, 562, 573, 580, 585, 590, 596, 601, 606, 611, 644,

649, 654, 664, and reporting that she planned and went on a cruise in September 2018, R. 597,

602, 607, 612, 645.

     Moreover, ALJ Knight explained why she found Dr. Carroll's reaching and handling

limitations "not medically necessary." R. 35. She wrote that Carol's "examinations did not reveal

any abnormalities in [her] manual dexterity, upper extremity range of motion, or grip strength."

*Id.* And, she pointed out that "during his own evaluation of the claimant, Dr. Carroll noted [that

she] could handle objects with both gross and manual motor dexterity." *Id.* This reasoning is also

supported by substantial evidence. Dr. Carroll opined that Carol could "frequently" reach and

handle, R. 392, but he did not define that term in his report, *see generally* R. 388–95, and it is not

clear whether he intended to restrict her manipulative capacities, R. 392 ("Functional Capacity

Information: . . . Manipulation (frequently, occasionally, never)."). *Compare* R. 469 (NP Rider

opining that Carol could "frequently" sit, meaning that she could "perform the activity 1/3 up to

2/3 of an 8-hour workday"). In any event, Dr. Carroll's exam findings do not support limitations

on reaching and handling. He observed full muscle strength throughout Carol's upper

extremities, R. 391; intact fine manual motor dexterity, *id.*; successful digit-to-digit, finger-to-

nose, nose-to-finger, and rapid alternating movement of palms testing "without difficulties," R. 391–92; normal sensory feeling in Carol's fingertips, no difficulties with maneuvers like pinching or picking up small objects, and the ability to grasp with fingers and hands bilaterally, R. 392; and full range of motion in Carol's shoulders, elbows, wrists, and hands, R. 393. If Dr. Carroll used the term "frequently" to mean that Carol could only reach and handle objects up to two-thirds of the time as defined by the regulations, *see* SSR 83-10, 1983 WL 31251, at *6, as it appears ALJ Knight interpreted the opinion, then it is entirely unclear how Dr. Carroll arrived at that limitation from his objective findings and Carol's reported limitations. Similarly, none of the other objective findings in the record show that Carol had any difficulties reaching or using her hands. *See* R. 291, 313–14, 324–25, 330, 337, 345, 457, 462, 489, 495–96, 549, 562, 567, 573, 580, 585, 590, 596, 601, 606, 611, 644, 649, 654, 659, 664.

Finally, the fact that Dr. Carroll's and NP Rider's opinions of Carol's ability to handle and reach were facially similar, *see* R. 392, 469, does not, in this instance, suggest that ALJ Knight should have given more weight to either of their opinions. In evaluating a medical opinion, an ALJ must consider the extent to which that opinion is consistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4). Consistency between medical opinions certainly may lend credence to the limitations provided therein. But the ALJ must also consider whether those medical opinions are consistent with and supported by other relevant evidence in the record. *Id.* § 404.1527(c)(3)–(4). And here, the objective evidence affirmatively showed that Carol had *no* difficulties with reaching or handling. R. 391–94; *see also* R. 291, 313–14, 324–25, 330, 337, 345, 457, 462, 489, 495–96, 549, 562, 567, 573, 580, 585, 590, 596, 601, 606, 611, 644, 649, 654, 659, 664. Indeed, Carol did not even allege difficulties in those areas. *See* R. 48–60, 217–24, 234–41. The record simply does not support any reaching or handling limitations, and ALJ

24

Knight correctly pointed that out. *See* R. 35. ALJ Knight's assignment of weight is thus

supported by substantial evidence, and this Court must defer to her finding. *Dunn*, 607 F. App'x

at 271; *Shinaberry v. Saul*, 952 F.3d 113, 124 (4th Cir. 2020) (ALJ properly awarded "little"

weight to an opinion where the ALJ explained that it was "not supported by an explanation" and

"not consistent with treatment records"); *Hall v. Saul*, No. 1:19cv1637, 2020 WL 6156535, at

*5–7 (D.S.C. Oct. 21, 2020) (affirming ALJ's rejection of restrictive medical opinion regarding

use of claimant's hands where claimant's providers generally did not note "restrictions in

Plaintiff's manipulative activities," observed "normal strength and sensation with no atrophy of

bilateral upper extremities," and noted that claimant "denied problems with tingling, muscle

pain, or muscle weakness").

> 2.   *ALJ Knight's decision not to include mental functional limitations in the RFC is supported by substantial evidence*

ALJs must follow a "special technique" whenever a claimant alleges disability based on a

mental impairment. *Patterson*, 846 F.3d at 659 (citing 20 C.F.R. § 404.1520a). First, the ALJ

determines whether the claimant produced sufficient evidence to establish the existence of a

"medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1); *see id.* § 404.1521.

Second, assuming the claimant clears the first step, the ALJ must "rate the severity of [the]

mental impairment(s)," 96-8p, 1996 WL 374184, at *4, by determining the degree to which it

interferes with the claimant's overall "ability to function independently, appropriately,

effectively, and on a sustained basis" in four areas of mental functioning: (a) understanding,

remembering, and applying information; (b) interacting with others; (c) concentrating, persisting,

or maintaining pace; and (d) adapting and managing oneself, 20 C.F.R. § 404.1520a(c)(2)–(3).[8]

---

[8] ALJs use a five-point scale to document these ratings: "None, mild, moderate, marked, and extreme.
The last point on the scale represents a degree of limitation that is incompatible with the ability to do any
gainful activity." *Id.* § 404.1520a(c)(4); *accord* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(a)–(e)

The ratings should be based on all the relevant evidence in the record, including clinical signs on mental-status exams, the nature and efficacy of any treatment, and the claimant's symptoms or other statements describing how her mental impairment impacts her overall functioning in these areas. *See id.* § 404.1520a(c)(2). Next, the ALJ determines at steps two and three whether "the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659. If the ALJ rates the claimant's "degrees of . . . limitation as 'none' or 'mild,'" then she usually will also conclude that the impairment is "not severe" because it does not cause "more than a minimal limitation in [the claimant's] ability to do basic work activities," 20 C.F.R. § 404.1520a(d)(1), like remembering "simple instructions," exercising judgment, and dealing with changes in a routine work setting, *id.* § 404.1522(b). *See also* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E), (H).

Finally, even when a mental impairment is properly found to be nonsevere, the ALJ must consider the extent to which the impairment and any related symptoms impact the claimant's ability to perform more specific work-related functions (e.g., following directions, exercising judgment, responding appropriately to other people, handling stress) under ordinary workplace conditions. *See Alla Z. v. Berryhill*, No. 5:17cv61, 2018 WL 4704060, at *3–4 (W.D. Va. Sept. 30, 2018) (citing 20 C.F.R. § 404.1545; SSR 96-8p, 1996 WL 374184, at *2–3, *5); SSR 85-16, 1985 WL 56855, at *1 (Jan. 1, 1985). "This RFC assessment is a holistic and fact-specific evaluation," *Patterson*, 846 F.3d at 659, that must reasonably account for any work-related functional limitations the ALJ identified when rating the impairment's severity, *Mascio*, 780 F.3d at 638 (step three); *Ashcraft v. Colvin*, No. 3:13cv417, 2015 WL 9304561, at *8–10

---

(defining a similar five-point rating scale used at step three as: none or no limitation; mild or "slight" limitation; moderate limitation or "fair" functioning; marked or "serious" limitation; and extreme limitation or "not able to function in [the] area independently, appropriately, effectively, and on a sustained basis").

(W.D.N.C. Dec. 21, 2015) (step two). *See also* SSR 96-8p, 1996 WL 374184, at *4.

Alternatively, the ALJ may explain why an overall limitation in any of the broad functional areas

"does not translate into a [specific] limitation" on the claimant's capacity to do work-related

mental activities. *Mascio*, 780 F.3d at 638.

Carol argues that ALJ Knight erred because she found Carol to have "mild" limitations in

each of the four areas of mental functioning when performing the "special technique" at step

two, but then did not include any mental limitations in the RFC. *See* Pl.'s Br. 16–18. In short,

Carol argues that because ALJ Knight recognized that Carol had at least *some* mental limitations,

she should have accounted for those limitations in the RFC. I disagree.

Carol's argument attempts to extend the Fourth's Circuit's reasoning in *Mascio*. There,

the Fourth Circuit concluded that an ALJ who determines that a claimant has a "moderate"

limitation in the functional area of concentration, persistence, or pace must either account for that

limitation or explain why she declines to do so. *Mascio*, 780 F.3d at 638; *see also Shinaberry*,

952 F.3d at 120–22; *Sizemore v. Berryhill*, 878 F.3d 72, 80–81 (4th Cir. 2017). But importantly,

a "moderate" limitation is greater than a "mild" limitation, and the Fourth Circuit has not decided

whether to extend *Mascio* to those instances in which an ALJ identifies only "mild" mental

limitations when performing the "special technique." *See Britt v. Saul*, --- F. App'x ---, ---, 2021

WL 2181704, at *5 n.3 (May 28, 2021).

Here, moreover, ALJ Knight *did* explain why Carol's "mild" mental limitations did not

more than minimally impact her ability to perform basic work-related activities. At step two,

ALJ Knight found that Carol's depression and anxiety were not severe impairments. *See* R. 26–

29. She explained that Carol's primary care provider "generally described her mental

impairments as stable" and that her examinations were "generally unremarkable," showing "no

mood, affect, behavior, or judgment abnormalities." R. 27 (citing R. 308–83, 397–452, 483–

542); *see also id.* (citing R. 472–73). She also noted that Carol "improve[d] with treatment,"

could "engage in a number of daily activities," and "did not require any formal mental health

treatment or inpatient psychiatric care." *Id.* Thus, ALJ Knight concluded that "[t]he medical

evidence as a whole fail[ed] to show that the claimant's mental impairments, considered both

singly and in combination, more than minimally limited her ability to perform basic mental work

activities." *Id.* ALJ Knight also credited the DDS psychologists' medical opinions that Carol's

mental impairments were "not severe," explaining that the record supported their conclusions. R.

27–28 (citing normal examination findings and physician observations, improvement with

treatment, conservative mental health treatment, and Carol's daily activities). And she credited

Dr. Cianciolo's findings to the extent that they were supported by and consistent with the

medical evidence. *See* R. 28 (explaining that the medical evidence showed, "as Dr. Cianciolo

f[ound], that the claimant's medical impairments do not more than minimally affect her ability to

perform complex work, maintain regular attendance, perform work on a consistent basis, accept

instructions from supervisors, and complete a normal workday for the reasons explained

herein"). ALJ Knight then performed the "special technique," citing Carol's daily activities,

normal examination findings, and conservative treatment to conclude that Carol had only a

"mild" limitation in each of the four mental functional areas. R. 28–29. Finally, in assessing

Carol's RFC, ALJ Knight cited Carol's daily activities, R. 35, and mentioned that Carol's

providers "generally failed to note any abnormalities in her attention, concentration, memory, or

cognitive functioning," R. 33.

     Carol does not challenge ALJ Knight's findings at step two, but she contends that ALJ

Knight nonetheless should have included mental functional limitations in the RFC. Pl.'s Br. 18

("The evidence as a whole may not support a severe mental impairment, but it certainly supports that Plaintiff would have additional non-exertional impairments that could further reduce Plaintiff's ability to engage in sustained work on a regular and continuing basis."). Importantly, however, she does not identify any specific mental functional limitations that ALJ Knight should have included in the RFC. *McAnally v. Astrue*, 241 F. App'x 515, 518 (10th Cir. 2007) (explaining that claimant did "not identify any functional limitations that should have been included in the RFC [assessment] or discuss any evidence that would support the inclusion of any limitations") (alteration in original). Carol cited some of her symptoms and some of the medical evidence in her brief, *see* Pl.'s Br. 17, but she did not explain what functional limitations ALJ Knight should have included in the RFC or discuss why any mental limitations were warranted in light of the record as a whole, *see id.* at 16–18. Read as a whole, ALJ Knight's analysis shows that she acknowledged Carol had some "mild" mental limitations, but concluded, based on the evidence in the record, that they did not more than minimally impact her ability to perform basic work activities. Accordingly, I find that ALJ Knight adequately explained her determination not to include any mental limitations in Carol's RFC, and I find that her decision is supported by substantial evidence and decline to reweigh the evidence. *See Morgan v. Saul*, No. 1:19cv3, 2020 WL 290870, at *4–5 (W.D.N.C. Jan. 21, 2020) (finding ALJ did not err by not including mental RFC limitations corresponding with claimant's credited "mild" mental limitations where the ALJ "clearly examined all the available evidence and found Plaintiff had not successfully shown" that RFC limitations were warranted); *Pavlic v. Saul*, No. 1:19cv146, 2020 WL 1326217, at *2–3 (M.D.N.C. Jan. 14, 2020) (finding no error where ALJ identified "mild" mental limitations in each of the four functional areas, but included no corresponding limitations in the RFC because ALJ sufficiently explained that "the record as a whole," including

claimant's treatment, examination findings, and medical opinions, did not support any mental functional limitations).

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 17, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 12, 2021

Joel C. Hoppe
United States Magistrate Judge

30